[No. 11437.  Department One.  December 5, 1913.]

THE STATE OF WASHINGTON, *Respondent*, v.
WILLIAM J. AURAND, *Appellant*.[1]

CRIMINAL LAW—EVIDENCE—IDENTITY OF ACCUSED — SUFFICIENCY.
The identity of accused, who was chased from the scene of an attempted burglary, and caught by a policeman, is a question for the jury, where the policeman testified that the accused fled, dodging around corners, that he gave chase and had accused in view after making each turn until the capture, especially where the accused was a witness in his own behalf and his testimony was unsatisfactory.

CRIMINAL LAW — TRIAL — INSTRUCTIONS — PRESUMPTION OF INNO-
CENCE.  In an instruction on the subject of reasonable doubt as to the identity of the accused, an expression to the effect that if he is the man "to blame" or "not to blame" the jury must say so, is not prejudicially erroneous in that it tends to minimize or destroy the legal presumption of innocence, where the instructions as a whole did not tend to authorize a conviction unless the jury found his conduct blameless, and from the context it is evident that "blame" was used as synonymous with the word "guilty."

Appeal from a judgment of the superior court for King county, Ronald, J., entered January 25, 1913, upon a trial and conviction of burglary.  Affirmed.

*Ivan Blair* and *Leola M. Blinn*, for appellant.

*John F. Murphy* and *H. B. Butler*, for respondent.

CHADWICK, J.—Defendant is charged with the crime of burglary in the second degree.  The only question in the case is one of identity.  The burglary is not denied, but the defendant insists that he is not the one who is guilty of the offense.  At about 11:30 o'clock, p. m., on the 20th day of December, 1912, a man was discovered in an attempt to burglarize a tailoring establishment in the city of Seattle.  A policeman was called.  The man was seen by the one who first discovered his presence, but upon the witness stand this person was not willing to swear that the defendant was the same man.  When

[1]Reported in 136 Pac. 1139.

discovered, the burglar fled. The policeman gave chase. The burglar was 150 to 200 feet ahead of the officer. The tailoring establishment was located on or near the corner of First avenue and Seneca street, in the city of Seattle. The burglar ran up Seneca street, thence through an alley to Spring street, thence east on Spring street to Second avenue, thence south on Second avenue to Madison street, thence east for a block or two, where defendant was arrested. When the chase began, the officer fired two shots. Defendant accounts for his presence and his running, saying that he was a stranger in the city; that he had been down on the water front looking for a job longshoring; that he was walking up the hill; that he heard the shots and ran in order to keep out of trouble. The testimony of the officer on the question of identity is substantially as follows:

"Q. I will ask you whether or not you saw this defendant on that night? A. Did I see him? Yes, chased him four blocks. . . . Q. Under what circumstances did you see this defendant that night? A. Well, I was coming up First avenue on my beat, and got right there at Mr. Curran's store, and he come out, and he said, 'I think there is somebody back out in the alley. I have got a bell that goes through the back end, and that don't ring unless somebody touches it.' So we went around to take a look, went into the alley, and I threw up my light and I couldn't see anybody. . . Q. Was anybody with you? A. Mr. Curran was with me. Q. Where was he? A. Back of me. . . . I threw the light around and didn't see anybody, and I turned to come out, and as I turned I threw the light up like that, and Mr. Curran seen this fellow and he says, 'There he is.' With that I beat it out. I got to Seneca street and he was just going down the alley and I took after him. . . . Q. Where did he go then? A. He dove around the corner and went up Spring to Second; and I got to the corner of the alley just in time to see him go down Second and I kept after him. . . . The Court: He ran down the alley to Madison? A. No, he ran down Second to Madison. He ran down the alley from Seneca to Spring; then ran up Spring to Second; then ran down Second to Madison; and I had him in sight every turn. I could just see him; so I kept after him. When I got to Second and

Madison, I looked up, and he was half way up the hill again up to— The Court: He was half way where? A. Half way to Third on Madison. . . . Q. Then what happened? A. He stopped and I went up and took hold of him and led him down to the box and sent him in. . . . Q. And so you stood there and looked up that grade and saw a fellow just disappear into the alley? A. Yes, sir. Q. And you followed him? A. You bet I did. Q. How far do you think it is from this little blind alley that you came out of there, up to this platted alley? A. Oh, it is probably 50 feet; 40 or 50 feet. Q. You could not—that party you saw around the tailor shop, at any time that you saw him there, you don't pretend that you could identify him, do you? A. Well, I didn't see him. All I saw was somebody disappear down the alley. Q. Then you got no view of him except it was just somebody? A. Yes, sir; but I had somebody in sight all the time. . . . Q. Could you see any one at the time you fired? A. I seen this man running. Q. Could you see any one else? A. No. . . . Q. How far were you behind the man you were following? A. I was about 200 feet, after I first got sight of him, after I got to the alley. Q. After you got into the alley, he was about 200 feet in advance of you? A. Yes. Q. At the time the man turned out of the alley into Spring street, how far in advance of you was he? A. Possibly 100 feet or 150 feet. Q. And you lost sight of him then? A. At that time for a minute. Q. And you also lost sight of him when he went into the alley? A. Sure I did. Q. When you were running from this blind alley up to the main alley, he was out of your sight? A. He was out of my sight until I got to the corner. . . . Q. This man that you chased down the alley in that chase, did you become familiar enough with his appearance, so that when you lost sight of him and picked him up again, you knew it was the same person? A. Yes, I took a view of him. Q. How many men were running that night, that you saw? A. I didn't see anybody. Q. Whenever you picked this fellow up again he was still running? A. Still running. He appeared to be getting slower, of course. I kept sight of him. . . . Q. So that the fellow you caught, you know is the same fellow you were chasing? A. Positively."

This testimony, coupled with the fact that defendant was a witness in his own behalf, and that his testimony, as we

read it in the record, seems unsatisfactory, and must have been so considered by the jury, leads us to believe that the testimony was sufficient to carry the question of identity to the jury.

The following instruction is complained of:

"Now the burden is on the state to prove that he is the party. He is presumed to be innocent and entitled to the benefit of this presumption, unless the state has overcome that and satisfied you by the evidence, beyond a reasonable doubt, that this defendant is the party who committed the burglary. It is not enough that the state may have shown you that it is probable this is the man. That is all that you have to be satisfied of in a civil action—probability on one side or the other. In a criminal case, you may believe that he probably is the man, yet have a reasonable doubt. On the other hand, the state don't have to satisfy you so conclusively and to such an absolute certainty that there is no possibility of being mistaken whatever. Very few things in the domain of human knowledge are susceptible of such absolute proof as that. You may be satisfied of a thing beyond a reasonable doubt, and yet you may possibly be mistaken. So you don't have to be satisfied to an absolute certainty; but you must be satisfied to a moral certainty. Now, if you are satisfied beyond every reasonable doubt that this young man is the man who committed burglary, then you will find him guilty, notwithstanding the fact that you may possibly be mistaken about it. You men and women are fair and impartial and don't care whether he is the man or not. If he is the man who is to blame, you must say so. If he is not to blame, you must say so. So, examine carefully all the evidence in this case, and if you can say and feel that you have an abiding and a settled conviction that this is the man, then you are satisfied beyond a reasonable doubt. If you have not such a conviction in your mind, you are not satisfied."

The words, "If he is the man who is to blame, you must say so. If he is not to blame, you must say so," are complained of. It is said that the instruction tends to minimize, if not destroy, the legal presumption of innocence and that the use of the words last quoted places a heavier burden on the de-

fendant than the law warrants. The court had fairly instructed the jury, and we think that it cannot be said that the instruction tended to produce in the minds of the jury a belief that unless the defendant's conduct in question was blameless, he should be convicted. The word "blame" must be construed as a part of the entire instruction, and when so considered, it is evident that the court used the word "blame" as synonymous with the word "guilty." The whole context of the instruction seems to make this conclusion certain. When so considered, the words will not be held to be misleading.

The judgment is affirmed.

CROW, C. J., MAIN, ELLIS, and GOSE, JJ., concur.